**Mark LOTT, Appellant (Defendant Below),**

v.

**STATE of Indiana, Appellee (Plaintiff Below).**

No. 49S00–9410–CR–988.

Supreme Court of Indiana.

Dec. 23, 1997.

Andrew W. Swain, Indianapolis, for Appellant.

Jeffrey Modisett, Attorney General, Arthur Thaddeus Perry, Deputy Attorney General, Indianapolis, for Appellee.

SHEPARD, Chief Justice.

A jury found Mark Lott guilty of murder [1] and conspiracy to commit murder [2] in the death of Carla Stotts. The court merged the conspiracy conviction with the murder conviction and sentenced Lott to fifty-five years for murder. This direct appeal ensued.

Lott raises ten legal errors which we condense as follows:

1) Whether the evidence was sufficient to support the murder and conspiracy convictions;

2) Whether the State sufficiently rebutted Lott's alibi claim;

3) Whether statements by a coconspirator and hearsay testimony regarding Lott's motive were properly admitted;

4) Whether the court and the bailiff conducted improper *ex parte* communications with the jury;

5) Whether Lott is entitled to reversal based on the State's alleged failure to disclose the confidential informant status of one of its witnesses, and the alleged benefits she received for her testimony;

6) Whether the acquittal of another coconspirator requires reversal of Lott's conspiracy conviction; and

7) Whether the recantation of the testimony of the State's witness requires reversal.

**1.** Ind.Code Ann. § 35–42–1–1 (West Supp.1997).

**2.** Ind.Code Ann. § 35–41–5–2 (West 1986); § 35–42–1–1.

## Facts

On January 24, 1993, Carla Stotts and appellant's brother Walter Lott were arrested. Walter Lott was charged with attempted murder, resisting law enforcement, and carrying a handgun without a license. Stotts was charged with resisting law enforcement. Stotts entered into a plea agreement under which she agreed to plead guilty to her crime, a class D felony, and to testify against Walter Lott in exchange for entry of her conviction as a class A misdemeanor, a one-year suspended sentence, and one-year probation.

Sheila Harris dated Walter Lott and was acquainted with Mark. During the first five months of 1993 while Walter was in jail, Harris took part in three-way telephone calls with the two brothers. When ask about the subject matter of the conversations between Walter and Mark, Harris's testimony was the following:

> It was talked about in the very beginning about making sure Carla did not testify against Walter. It was talked about making sure she didn't testify by shutting her up. It was talked about slitting her throat so the bitch doesn't ever talk anymore.

(R. at 815.) Mark was not included in all the conversations in which Walter suggested cutting Carla's throat. Walter sometimes discussed his plans with Harris alone. However, the conversations between Mark and Walt were considered by Harris as too numerous to count and the topic of discussion was always Carla Jo Stotts.[3] (R. at 814).

On April 16, 1993, Harris met Mark at his place of business and told him Stotts had signed a plea agreement with the State. Later that day, Walter Lott called Harris and a three-way conversation with Mark Lott took place. According to Harris, when Walter Lott confirmed Stotts's plea agreement,

**3.** Paul Jacobs also testified that when he asked Mark what he meant when Mark said Carla was not going to testify against anybody, Mark replied by stating "she is never going to testify against anybody" while moving his finger across his throat. (R. at 910.)

Mark became disturbed, mumbled it would not happen, and hung up.

Sheila Harris and the brothers talked again on April 27, 1993. Harris testified that in response to Walter's concern that his court date was fast approaching, Mark Lott said, "Don't worry. Everything's under control. Me and Mikey will take care of it this weekend." (R. at 819.) Mikey Young is Mark Lott's cousin.

On April 30, 1993, Janet Marquez and Stotts dined with two men at Marquez's apartment. After dinner, Marquez and her date went to a club and did not return until close to 3 a.m. Stotts remained at Marquez's apartment with her companion. Stotts left Marquez's apartment for home around 3 a.m. She was alone.

At about 3:45 a.m. on May 1, 1993, voices in the parking lot near her apartment awoke Maureen Sater. She listened in bed for a few minutes, and then arose to look out her open window. She saw Stotts standing in the parking lot with two males. The two unidentified males appeared to Sater to be taller than Stotts, who was 5'8". She estimated them to be about six feet tall. Sater watched for three to five minutes. She saw one of the men touch Stotts, apparently on the shoulder, and heard profanity. Then, the two men pulled away in their car with the lights off. Stotts appeared to reach into her car for something. Thinking everything was all right, Sater went back to bed.

Everything was not all right. About 4:15 a.m., police dispatchers sent officers to Stotts's neighborhood address. Deputy Alonzo Watford arrived three minutes later. He found Stotts kneeling in the upstairs of her apartment complex and holding her neck. Eric Sater and Shelli Stotts, Carla's sister, were helping her. Deputy Watford called for assistance; medics were already en route and arrived about a minute later. The doctor at the hospital pronounced Stotts dead at 4:56 a.m.

An autopsy revealed that Stotts suffered a deep laceration of the neck. The incision punctured the right jugular vein. Massive loss of blood from the laceration caused Stotts's death. Such a wound requires the use of a sharp cutting edge.

An investigation commenced. Marquez and Shelli Stotts gave the assigned detective Harris's name. That detective and a lieutenant went to her home at 4 p.m. on the day of Stotts's death. When the officers entered Harris's home, they asked, "Are you now or have you ever been a girlfriend of Walter Lott?". Harris immediately responded, "Oh, my God, don't tell me Carla's dead." (R. at 637–38.) The officers asked if she had learned about Stotts's death by watching television, listening to the radio, or reading the newspaper. Harris said no.

Harris agreed to go to headquarters where the police read her the *Miranda* rights. She also agreed to talk. The detective made no promises of leniency or threats. She told police about the threats made by the Lott brothers against Stotts, the phone conversations about blowing Stotts's brains out and slitting her throat, and the statements that Stotts would not talk or testify. Harris acknowledged at trial that she did not divulge everything she knew all at once.

At the end of the interview, Harris offered to call Mark Lott. The police recorded the conversation. Unaware that the conversation was being recorded, Mark Lott responded to the news of Stotts's death in disbelief. After taking Harris back to her home, the two officers drove to Mark's house. He was not home, so they left a business card and a message with his mother indicating they would contact him the next day.

Soon thereafter, Mark Lott telephoned headquarters and said he wanted to come down and get it over with. He arrived at about 8:15 p.m. The police informed Lott of his rights, and he agreed to talk. When asked if he knew a Sheila Harris, he responded that he thought so, but was not sure.

Harris further testified that several days after she made her first statement to the police she participated in other three-way calls with Walter and Mark. In one conversation, Mark stated that Harris should keep her mouth shut so the police would not find out he killed Stotts. In another conversation, Walter asked Mark if he got rid of "it,"

and Mark retorted that the police would never find "it." (R. at 823.)

## I. Sufficiency of the Evidence

■ Mark Lott argues that the evidence was insufficient to support his convictions. As to the murder conviction, he claims that Sater's testimony regarding the height of the assailants positively excludes him from consideration as the killer. Sater testified that Stotts's two assailants were both taller than 5'8". Lott is only 5'2".

■ This Court, however, does not resolve conflicts in the evidence or reweigh the evidence. *Marshall v. State*, 621 N.E.2d 308 (Ind.1993). It is the jury's responsibility to resolve such conflicts. *Id.* Harris testified that Mark, during one of their telephone conversations, stated, "If you tell Sheila to keep her f—ing mouth shut and quit running down there and talking with the police, they won't find out that I did anything; that I killed Carla." (R. at 822.) Faced with discrepancies between Sheila's testimony and Maureen's observation of the assailants, the jury apparently believed Sheila. We expect juries to resolve such conflicts.

■ Lott takes issue with Paul Jacobs's trial testimony. First, Lott claims that Jacobs's testimony at trial conflicted with that of his deposition, and was thus not credible. Witness credibility is a matter reserved for the jury. *Tillman v. State*, 642 N.E.2d 221 (Ind.1994). Lott argues that this conflict merits an explanation, and that the State's failure to provide one prevented the jury from properly weighing or considering Jacobs's credibility. Lott cites *Wofford v. State*, 271 Ind. 518, 394 N.E.2d 100 (1979), arguing that it holds the State must explain a conflict in witness testimony. *Wofford* does not so hold. While the defendant in *Wofford* received an explanation for the witness's change in her testimony, *Wofford* does not state that an explanation is required. A sponsoring party may well attempt to rehabilitate a witness by offering explanations for apparent conflicts, but assessing such conflicts or the lack of explanations for them is a matter assigned to the judgment of juries.

Lott also claims Jacobs's testimony was based on conjecture and speculation. Jacobs testified about a particular discussion he had with Lott. His testimony, if believed by the jury, is hardly speculative.

Finally, Lott relies on *Gaddis v. State*, 253 Ind. 73, 251 N.E.2d 658 (1969), claiming that Jacobs's testimony is "inherently dubious." Under the rule in *Gaddis*, this Court may infringe upon the jury's determination of a witness's credibility only when confronted with " 'inherently improbable' testimony or coerced, equivocal, wholly uncorroborated testimony of 'incredible dubiosity.' " *Tillman*, 642 N.E.2d at 223. Jacobs's testimony was not coerced, equivocal, or uncorroborated. Jacobs's testimony, coupled with Harris's, supports the murder conviction.

Lott also urges that his conspiracy conviction was not supported by sufficient evidence. He claims Harris's testimony regarding her three-way telephone conversations with him and Walter must be rejected. Lott asserts that Harris's trial and deposition testimonies are contradictory, that her trial testimony is speculative, and that the conflicts render her testimony "inherently dubious." Lott takes issue, in particular, with the contradictions in Harris's testimony about the conspiratorial conversations. This, too, only asks us to reweigh the evidence.

■ Lott claims the evidence failed to prove that he agreed to kill Stotts. Circumstantial evidence, however, is sufficient to prove the necessary agreement. *Miller v. State*, 623 N.E.2d 403 (Ind.1993). Harris's testimony about the brothers' conversations, the corresponding timing of the murder, Harris's unprompted comment when the police arrived, and Jacobs's testimony were sufficient for the jury to infer Mark was part of an agreement to kill Stotts.

Lott also claims that the State's own acts expose a fatal variance in the State's proof that a conspiracy existed. He notes that the jury was instructed that the State had to prove he conspired with Walter Lott, Harris, and the two males observed on the night of the murder, and that the two males committed the overt act of slashing Stotts's throat. Lott argues the State's dismissal of charges against Harris incurably corrupts its conspiracy theory. He claims the State dropped the

charges because it did not believe she conspired with Mark. However, circumstantial evidence—the inference that the two males committed the murder in concert with Mark, Walter, and Harris's discussions about carrying it out—is sufficient to infer Mark's agreement. The State's decision not to pursue its conspiracy case against Harris is within the scope of prosecutorial discretion.

The evidence was sufficient to support both convictions.

## II.  Jury Was Free to Disbelieve the Alibi

Lott claims the State failed to rebut his alibi. Lott testified that on the night before Stotts's death, he left work at 9 p.m. When he returned home that evening, his mother and sister were there. Lott resided with his parents. Shortly after his arrival, his girlfriend visited. Lott testified that his girlfriend stayed until midnight and that after she left, he went to bed. Lott also testified he did not leave the house until the next morning when he left for work.

■ The State is not required to rebut directly a defendant's alibi. It may disprove the alibi by proving its own case in chief beyond a reasonable doubt. The jury may choose not to believe an alibi if the State's evidence in chief is such to render disbelief reasonable. *Jones v. State*, 267 Ind. 680, 372 N.E.2d 1182 (1978).

The State's evidence was sufficiently credible to permit the jury to reject Mark's alibi.

## III.  The Statements of Co-conspirators

The State called Harris to testify about the numerous three-way telephone conversations she facilitated between herself, Mark, and Walter. Mark objected on grounds that Harris could not testify until the State provided independent evidence of the conspiracy between the three. Mark also objected to Harris's testimony relating statements by Walter, saying these are hearsay statements as to him.

Our rules declare that "a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy" is not hearsay. Ind.Evidence Rule 801(d)(2)(E). The Indiana case law developed before the

adoption of the rules of evidence also treated such statements as admissible, but required that the State provide other evidence, either circumstantial or direct, that the conspiracy existed as a precondition to admitting the hearsay. *Chinn v. State*, 511 N.E.2d 1000, 1002 (Ind.1987). Thus, a witness who was not a participant in a robbery could testify about the statements of one of the conspirators only where independent evidence existed that there was a conspiracy and that the defendant was part of it. *See Mayhew v. State*, 537 N.E.2d 1188, 1190–91 (Ind.1989) (witness to whom defendant earlier described the conspiracy permitted to testify about statements made by co-conspirator).

We have viewed this "independent evidence" requirement as a useful safeguard against abusive use of co-conspirator hearsay, and will continue to apply it to evidence proposed for admission under Rule 801(d)(2)(E).

■ As for the present case, Harris's testimony about her role facilitating the numerous conversations of the three conspirators—herself, Mark, and Walter—was not hearsay at all. It was firsthand evidence of the existence of the conspiracy and was plainly admissible. Her testimony about things said by Walter was governed by Rule 801 and the independent evidence requirement. Her own testimony, of course, described the existence of the conspiracy and thus rendered her relating of Walter's statements admissible. No error here.

## IV.  *Ex Parte* Communications Between Court and Jury

The jury announced they were deadlocked at 8 p.m. The court instructed the bailiff, without informing the parties, to tell them to continue deliberating. The jury indicated at midnight they had reached a verdict on one count, but were at an impasse on the other. Again, the court told the bailiff to tell the jury to continue deliberating. Then, the bailiff contacted defense counsel and the prosecution. Lott says that the court's failure to notify the parties of these communications requires reversal.

When the jury requests additional guidance from the court, proper trial procedure requires both parties be notified. *Moffatt v. State,* 542 N.E.2d 971 (Ind.1989); Ind. Code Ann. § 34–1–21–6 (West 1983). This Court will not reverse for improper *ex parte* communication, however, unless harm or prejudice resulted from that communication. *Moffatt,* 542 N.E.2d at 974.

In *Nichols v. State,* 591 N.E.2d 134 (Ind. 1992), a strikingly similar situation occurred. The jury started deliberating at about 3:30 p.m. Four and a half hours later they sent a note explaining that they had reached a verdict on one count, but were deadlocked on the other. The court returned a note instructing them to continue deliberating. Less than thirty-minutes later the jury reached a verdict on both counts. We held that the court's instruction did not result in harm or prejudice.

The same result obtained in *Wine v. State,* 539 N.E.2d 932 (Ind.1989). In *Wine,* the jury indicated they were unable to reach a decision, and the court instructed the jury to deliberate for one more hour. This Court held that failure to notify the parties did not constitute reversible error. *Id.*

Here, the trial court's unadorned communications with the jury did not coerce a verdict or prejudice Lott. He is not entitled to a reversal on these grounds.

## V. Harris as a Confidential Informant

Lott claims the trial court erred by declining to compel the State to disclose information concerning Harris's role as an informant. He says the State did not reveal that Harris received compensation for acting as a confidential informant in other cases. Lott claims Harris gave perjured testimony regarding her former activities. He says the prosecutor's failure to disclose payments to Harris deprived him of due process.

The prosecutor asked Harris on redirect about her role in the present case. He asked if she was paid for her testimony and she said "no." (R. at 900.) He then asked if the police had relocated her as a result of her cooperation "in this case," and she said she had received $200 in moving expenses. *Id.*

Lott says the failure of the prosecutor to limit his earlier question "to this case" makes Harris a perjurer. We say Harris's answers gave the jury a clear understanding of how much and why Harris was being paid.

On another point, however, the trial court agreed that information relating to Harris's paid activities as an informant *on prior occasions* should have been divulged. In assessing whether prejudice resulted entitling Lott to a reversal, the trial court applied the standard of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). A due process violation occurs when requested discovery is withheld and material. Information is considered material only if its suppression leads to the reasonable probability that had it been disclosed, the result would have been different. *Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383–84. *But see Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995) ("different result" does not mean "different verdict," but rather whether defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence").

We hold the trial court correctly determined, under the standard articulated in *Brady* and *Bagley,* that Harris's paid activities were not material. The jury knew Harris had been a confidential informant in the past and that she received $200 for relocation expenses regarding this case. Harris also faced extensive cross-examination about her own criminal record, potential penalties facing her, and her effort to evade paying the telephone company by supplying an alias.

Lott claims the State also failed to disclose a benefit Harris received in return for her testimony. Her attorney testified in a posttrial proceeding that the State opened the bidding by offering Harris a given plea agreement in return for her testimony. Harris considered the offer and then made a counter-offer. Harris's counsel testified that the State accepted the counter proposal to dismiss the charges in exchange for Harris's testimony. It is this agreement Lott claims was not revealed at trial.

■ A prosecutor must disclose to the jury any agreement made with the State's witness, such as promises, grants of immunity, or rewards offered in return for testimony. *McBroom v. State,* 530 N.E.2d 725 (Ind. 1988). The existence of an agreement, however, is a factual question, and we will affirm the trial court's determination if substantial evidence exists. *Id.*

■ About a week and a half before trial, the prosecutor spoke with Harris's attorney and when asked what he was planning on doing for Harris, the prosecutor said he still did not know. The following Monday, the prosecutor told Harris's attorney that he was going to drop the charges and subpoena her to testify. The prosecutor later told the court part of his reason for dismissing the charges was his realization that as a defendant she would have a Fifth Amendment right. When asked if he just simply dropped the charges, the prosecutor responded he had. Asked if there was an agreement, he stated, "None other than me subpoenaing her and telling her to tell the truth." (R. at 267.)

The trial court denied Mark's motion for relief from judgment on this issue. The court stated the issue concerning Harris's alleged agreement with the State had been fully explored, and that Lott presented no new, substantive evidence in support of his argument that the State failed to disclose an agreement with Harris. The trial judge apparently had it right.

## VI. Another Defendant's Acquittal Is Irrelevant

■ Lott claims he is entitled to acquittal because his brother Walter was acquitted of charges of aiding in the murder of Stotts and conspiring with him to kill her. Mark acknowledges that under Indiana Code § 35–41–5–2 the acquittal of a co-conspirator is not a defense to a conviction, and that the authority he cites, *Kiger v. State,* 537 N.E.2d 501 (Ind.1989), is *stare decisis* against him. It still is.

## VII. Recantation by Harris

Lott claims that Harris's recantation of her trial testimony qualifies as newly discovered evidence requiring a new trial.

■ To be entitled to a new trial based on newly discovered evidence a defendant must demonstrate the new evidence was discovered after trial, is material and relevant, is not cumulative, is not merely impeaching, is not privileged or incompetent, was not discoverable upon due diligence before trial, is credible, can be produced in the event of a retrial, and will likely produce a different result. *Bustamante v. State,* 557 N.E.2d 1313 (Ind.1990). The trial court held an evidentiary hearing after trial about Harris's recantation. It concluded that the defense failed to satisfy that the recantation was not merely impeaching, was worthy of credit, and was likely to produce a different result.

We review the denial of a motion for a new trial on the grounds of newly discovered evidence only for abuse of discretion. *Fox v. State,* 568 N.E.2d 1006 (Ind.1991). Such a ruling will be reviewed deferentially. *Id.* Judge Jack Tandy made careful and extensive findings about Harris's recantation. Mark Lott has not established abuse of discretion.

### Conclusion

We affirm the judgement of the trial court.

DICKSON, SULLIVAN and BOEHM, JJ., concur.

SELBY, J., concurs in result.