**Samuel FANCHER, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 49A02–0904–CR–301.**

Court of Appeals of Indiana.

Dec. 9, 2009.

---

18

Michael E. Caudill, Caudill and Associates, Indianapolis, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Joby D. Jerrells, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BARNES, Judge.

### Case Summary

Samuel Fancher appeals his convictions for murder and aggravated battery as a Class B felony. We affirm.

### Issues

Fancher raises two issues, which we restate as:

I.  whether Fancher's equal protection rights were violated by the admission of an informant's testimony because the informant received a reduced sentence in exchange for his testimony; and

II.  whether the evidence is sufficient to sustain his convictions.

### Facts

In late August or early September of 2007, Jerry Emerson went to Earl Henton's home on Euclid Avenue in Indianapolis looking for Johnny Wells. A few days later, Emerson's brother and some associates also went to Henton's house looking for Wells. Henton told Wells to "return the money that was supposed to have been taken from Deangelo Peden." Tr. p. 55.

On September 20, 2007, at approximately 8:00 p.m., Henton, Wells, Cornelius Stamps, Larry Wells, and Steven Chaney were outside Henton's residence. Henton noticed a white four-door Chevy Lumina with heavily tinted windows drive past. Later, Henton saw the same vehicle coming back down the street and heard twenty

to thirty shots coming from the vehicle. The men ran, but Stamps and Henton were shot. Henton was shot in the leg, and Stamps was shot in the chest and died. The police recovered shell casings from three different weapons at the crime scene on Euclid Avenue.

Detective Charles Benner of the Indianapolis Metropolitan Police Department interviewed witnesses and learned that Wells was likely the intended target of the shooting. Detective Benner issued a press release indicating that the police were looking for a white Chevy Lumina with dark tinted windows and a possible suspect wearing an orange hoodie. Curtis Williams was watching the news and heard the report regarding the shooting. Williams's brother, Eric, had recently sold a white Chevy Lumina with dark tinted windows to Emerson. Eric called Williams minutes later and was scared. The next day, Williams told Eric to have Emerson meet Williams in their neighborhood.

Emerson and Fancher then met with Williams. They were driving a blue older model car, and Fancher was wearing an orange hoodie. Williams asked them, "what happened?" Tr. p. 136. Fancher laughed and said that "he had to handle some business" and that he "had to holler at Johnny . . . because [Wells] ran off with . . . Bones' money." *Id.* at 136–37. Williams said that "hollered at" means to "[d]o a hit." *Id.* at 142. Fancher said that "they went over there and chopped them n* * * * * * downs," but that they only got $5,000.00 because they "hit the wrong person." *Id.* at 138. Fancher said that Wells was running too fast. Emerson said to tell Eric to stop complaining because "[t]hey ain't going to find that car." *Id.* at 141.

Williams was concerned about how Emerson and Fancher were looking at him.

Williams followed them to a house on Sherman Drive, and Williams parked at a nearby church and walked through the woods to the house. Williams saw someone tearing the window tinting off of the Lumina. Williams then called a friend and asked the friend to make an anonymous tip to the police regarding the Lumina's location. The police arrived, and Emerson and Fancher were arrested but were later released. The police found a shell casing at the Sherman Drive residence in the discarded window tinting. The shell casing and some casings recovered from the Euclid Avenue crime scene were fired from the same weapon. Fancher's fingerprints were found on the sticky side of the window tinting, and Fancher and Emerson's fingerprints were found on the Lumina.

In January 2008, Williams was arrested on federal drug charges and, facing a possible sentence of ten years to life in prison, he contacted the police regarding the Euclid Avenue shooting. Williams entered into a plea agreement and, in exchange for his cooperation, faced a sentence of no more than ten years.

The State charged Fancher and Emerson with murder and aggravated battery as a Class B felony. At Fancher's jury trial, Williams testified for the State, and Fancher did not object to Williams's testimony on equal protection grounds. Williams was questioned extensively about his plea agreement on both direct examination and cross examination. The jury found Fancher guilty as charged, and the trial court sentenced him to fifty-five years for the murder conviction consecutive to a ten-year sentence for the aggravated battery conviction. The trial court also ordered that the sentence be served consecutive to a previous sentence for a murder conviction.

## Analysis

### I. Equal Protection

Fancher argues that his equal protection rights were violated by the admission of Williams's testimony because Williams received a reduced sentence in exchange for his testimony.[1] According to Fancher, the State was able to "purchase" Williams's testimony in exchange for a reduction or elimination of Williams's sentence on other charges, but Fancher had "no way to compete with or 'out bid' " the State and "no way" of procuring testimony from other witnesses, who did not want to cooperate absent a benefit. Appellant's Br. p. 8–9. Although Fancher presents a novel argument, we conclude that the argument fails.

We first note that Fancher failed to object to Williams's testimony on this ground. As a general rule, the failure to object at trial results in a waiver of the issue on appeal. *Benson v. State*, 762 N.E.2d 748, 755 (Ind.2002). Waiver notwithstanding, the Equal Protection Clause of the U.S. Constitution states that no state shall "deny to any person within its jurisdiction the equal protection of the laws."[2] U.S. Const. amend. XIV, § 1. The Equal Protection Clause "does not reject the government's ability to classify persons or 'draw lines' in the creation and application of laws, but it does guarantee that those classifications will not be based on impermissible criteria or arbitrarily used to burden a group of individuals." *Lake County Clerk's Office v. Smith*, 766 N.E.2d 707, 712 (Ind.2002) (quoting *Phelps v. Sybinsky*, 736 N.E.2d 809, 818 (Ind.Ct. App.2000), *trans. denied* ).

In assessing a claim under the Equal Protection Clause, our first inquiry involves the applicable level of scrutiny. *Id.* "Laws that involve a suspect classification and those that burden the exercise of a fundamental right receive the strictest scrutiny." *Id.* (citing *Shepler v. State*, 758 N.E.2d 966, 969 (Ind.Ct.App.2001), *trans. denied* ). "Examples of fundamental rights are voting, procreation, interstate travel, presenting a defense in a criminal action; while examples of suspect classes are race, gender, national/ethnic origin and alienage." *State v. Alcorn*, 638 N.E.2d 1242, 1244–45 (Ind.1994). In order to survive strict scrutiny, a state action must be a necessary means to a compelling governmental purpose and be narrowly tailored to that purpose. *Lake County Clerk's Office*, 766 N.E.2d at 712. Classifications not involving a suspect class or a fundamental right are reviewed under a rational basis test. *Id.* This test merely requires that the statute be rationally related to a legitimate governmental purpose. *Id.*

---

1. We note that "[i]t is within a prosecutor's scope of authority to make promises and offers of immunity, leniency, money or other benefit to a State's witness to induce cooperation." *Sigler v. State*, 700 N.E.2d 809, 811–12 (Ind.Ct.App.1998) (citing *Schmanski v. State*, 466 N.E.2d 14, 15 (Ind.1984)), *trans. denied.* "[T]hese practices place a burden upon the prosecution because they tend to impair the credibility of witnesses or to show interest, bias or motives as a witness." *Id.* Further, "[a] prosecutor must disclose to the jury any agreement made with the State's witness, such as promises, grants of immunity, or rewards offered in return for testimony." *Lott*

v. *State*, 690 N.E.2d 204, 211 (Ind.1997). Here, Williams entered into a plea agreement regarding his federal drug charges. Fancher makes no argument that he was unaware of the federal court plea agreement with Williams and, in fact, cross examined Williams extensively regarding the agreement.

2. Although Fancher mentions the Indiana Constitution, he makes no separate argument regarding the Indiana Constitution. Thus, he has waived the argument. *See, e.g., Jackson v. State*, 735 N.E.2d 1146, 1150 n. 1 (Ind.2000).

Fancher argues that his right to present a defense, a fundamental right, is implicated here and, thus, strict scrutiny applies. Fancher concedes, however, that our supreme court has applied a rational basis test in addressing a similar argument. In *Walters v. State.* 271 Ind. 598, 394 N.E.2d 154 (1979), the defendant was charged with murder and two other men were charged with being accessories after the fact. One of the men was granted immunity and testified for the State, while the other man was called as a defense witness and asserted his Fifth Amendment right against self-incrimination. Although the defendant requested that the trial court grant the defense witness immunity, the trial court refused. On appeal, the defendant argued that he was denied equal protection because the State could grant immunity but a defendant could not. Our supreme court held:

> He ignores that equal protection rights apply only to those within the same class. The mandate for equal protection of the law does not prevent different treatment of persons in different classifications, if the classifications are reasonable and serve a legitimate purpose.

> The granting of immunity is somewhat analogous to plea-bargaining in that the State must often use such means with reluctant, but essential, witnesses. The State alone has the responsibility of prosecuting crimes. To meet that responsibility, the State, not the defendant, must have the authority to grant

immunity. There is no unlawful denial of equal protection here.

*Walters,* 271 Ind. at 602, 394 N.E.2d at 157 (internal citations omitted). Although not specifically explained, our supreme court in *Walters* used the rational basis test rather than a strict scrutiny test. The court concluded that the granting of immunity to a State's witness did not violate the defendant's equal protection rights.

Similarly, in *Arnold v. State,* 460 N.E.2d 494, 497 (Ind.1984), the defendant argued that "he was denied due process in that the state could grant immunity to witnesses but he could not." Relying on *Walters,* our supreme court held that the defendant's due process argument was the same as the equal protection argument in *Walters,* which the court had denied.[3]

*Walters* concerned immunity given to a State's witness. Here, Fancher's argument concerns the grant of a reduced sentence to a State's witness in exchange for his testimony. The State is correct that Fancher mistakenly "claims that a complete grant of immunity is somehow less egregious than" the grant of a reduced sentence. Appellee's Br. p. 7. Given our supreme court's resolution of *Walters,* we conclude that Fancher's equal protection claim must also fail. Fancher has failed to demonstrate that his equal protection rights were violated by the admission of Williams's testimony.

## II. Sufficiency of the Evidence

▮▮▮▮ Fancher argues that the evidence is insufficient to sustain his convic-

---

**3.** In *Bubb v. State,* 434 N.E.2d 120 (Ind.Ct. App.1982), this court considered a related argument. There, the defendant argued that the State should have granted immunity to a defense witness. This court held, "Although the defendant has no due process right to compel immunization of defense witnesses, the State may not use that power to interfere with the defense's presentation of its case or to prevent its witnesses from testifying." *Bubb,* 434 N.E.2d at 124 (citing *Webb v. Texas,* 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972); *Washington v. Texas,* 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967)). Fancher makes no argument that he was prevented from presenting a defense witness or that a defense witness should have been granted immunity.

tions.[4] When reviewing the sufficiency of the evidence to support a conviction, we must consider only the probative evidence and reasonable inferences supporting the verdict. *Drane v. State*, 867 N.E.2d 144, 146 (Ind.2007). We do not assess witness credibility or reweigh the evidence. *Id.* We consider conflicting evidence most favorably to the trial court's ruling. *Id.* We affirm the conviction unless "no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt." *Id.* (quoting *Jenkins v. State*, 726 N.E.2d 268, 270 (Ind.2000)). It is not necessary that the evidence overcome every reasonable hypothesis of innocence. *Id.* at 147. The evidence is sufficient if an inference may reasonably be drawn from it to support the conviction. *Id.*

Fancher first argues that Williams's testimony was incredibly dubious. Fancher contends that Williams had a motive to fabricate his version of the events and that the State "presented no evidence or testimony that linked [Fancher] in any way shape or form with the crime." Appellant's Br. p. 15. Appellate courts may apply the "incredible dubiosity" rule to impinge upon a jury's function to judge the credibility of a witness. *Love v. State*, 761 N.E.2d 806, 810 (Ind.2002). "If a sole witness presents inherently improbable testimony and there is a complete lack of circumstantial evidence, a defendant's conviction may be reversed." *Id.* "This is appropriate only where the court has confronted inherently improbable testimony or coerced, equivocal, wholly uncorroborated testimony of incredible dubiosity." *Id.* "Application of this rule is rare and the standard to be applied is whether the testimony is so incredibly dubious or inherently improbable that no reasonable person could believe it." *Id.*

The incredible dubiosity rule simply does not apply here. Williams's testimony was not inherently improbable, and the State presented circumstantial evidence that Fancher participated in the shootings on Euclid Avenue. Williams testified that his brother sold a white Lumina with dark window tinting to Emerson shortly before the shootings. A white Lumina with dark window tinting was used in the shootings, and one of the suspects was wearing an orange hoodie. Stamps was killed in the shooting, and Henton was wounded by a bullet to the leg.

Williams confronted Emerson and Fancher the day after the shootings, and Fancher, who was wearing an orange hoodie, admitted that they tried to kill Wells because Wells had stolen money. Fancher said that they only received $5,000 because they killed the wrong person. Acting on a tip from Williams, the police found the white Lumina, Emerson, and Fancher. The police found a shell casing at the Sherman Drive residence in the discarded window tinting. The shell casing and some casings recovered from the Euclid Avenue crime scene were fired from the same weapon. Fancher's fingerprints were found on the sticky side of the discarded window tinting, and Fancher and Emerson's fingerprints were found on the Lumina.

Given this evidence, the jury could have concluded that Fancher participated in the shootings on Euclid Avenue. We conclude

---

**4.** Although the State argues that Fancher appeals only his murder conviction, we note that Fancher argues that Williams's testimony was incredibly dubious. This argument applies to both the murder and the aggravated battery convictions. Consequently, we will consider the sufficiency of both convictions.

that the evidence is sufficient to sustain Fancher's convictions for murder and aggravated battery as a Class B felony.

### Conclusion

Fancher's argument that the admission of Williams's testimony violated his equal protection rights fails. Further, the evidence is sufficient to sustain Fancher's convictions for murder and aggravated battery. We affirm.

Affirmed.

NAJAM, J., and KIRSCH, J., concur.