## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**
May 13 2015, 9:46 am

Kevin S. Smith

**CLERK**
of the supreme court, court of appeals and tax court

ATTORNEY FOR APPELLANT

Kimberly A. Jackson
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Ellen H. Meilaender
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Darin Jackson,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff.*

May 13, 2015

Court of Appeals Case No. 49A02-1404-CR-230

Appeal from the Marion Superior Court

The Honorable Lisa F. Borges, Judge

Cause No. 49G04-1304-FA-23630

**Brown, Judge.**

[1] Darin Jackson appeals his conviction for conspiracy to commit criminal confinement as a class B felony. Jackson raises four issues which we consolidate and restate as:

  I.   Whether the trial court abused its discretion in replacing one of the original jurors with an alternate;

  II.  Whether the trial court abused its discretion in admitting certain testimony; and

  III. Whether the evidence is sufficient to sustain Jackson's conviction for conspiracy to commit criminal confinement as a class B felony.

We affirm.

### Facts and Procedural History

[2] Jackson and Carlton Hart were good friends, and Jackson knew Hart since Jackson was seven years old. Hart owned a music studio located at 46th Street and Evanston in Indianapolis. Shortly before November 15, 2012, Hart's cousin, who was a local rapper known as Bango, was shot and killed. Jackson knew Bango's mother "back in the day" and also knew Dwayne McDuffy ("Dwayne"), the father of James McDuffy ("McDuffy"), since Jackson was a teenager. Transcript at 408.

[3] On November 15, 2012, Jackson, Dwayne, and Hart went to the residence of Bango's mother. Hart and Jackson then dropped off Dwayne and picked up McDuffy. At approximately 3:00 p.m., Jackson, McDuffy, and Hart entered the Lowe's at 62nd Street and Keystone in Indianapolis. One of the men picked up a box cutter. McDuffy picked up a package of zip ties, and Jackson held his arms together in front of him crossed at the wrist and placed a package

of zip ties in the cart. At 3:18 p.m., McDuffy purchased a 2x4 stud of lumber, cable zip ties, washers, a coax cable connector, a box cutter, lip balm, duct tape, and zinc open bar holders. The men then drove to Hart's studio, and Hart later drove Jackson to a Wendy's restaurant where Jackson began work at 5:58 p.m. and worked until 2:53 a.m.

[4] Meanwhile, also on November 15, 2012, Marvin Finney, II, spoke with his cousin, Thomas Keys, a DJ, around 4:00 p.m. Finney drove his mother's minivan, picked up Keys, and drove to the music studio owned by Hart to work on a project honoring Bango. Finney was expecting to pick up music, probably listen to a couple of songs, accept money, and go home and work on the project. Dontee Robinson, known to Finney as D-Rob, let Finney and Keys into the studio. Finney knew Robinson from seeing rap videos on YouTube. McDuffy, whom Finney had met a week earlier at a concert, was also in the studio. Finney observed that they had a piece of wood across the door to block it.

[5] Robinson was "kind of tense" and asked Keys who killed Bango and what he knew about it, and Keys said that he knew just as much as Robinson and McDuffy knew. *Id.* at 127. Robinson and McDuffy kept insisting that Keys knew who did it and that he needed to tell them. Finney was on his phone texting one of his friends, and McDuffy asked him who he was texting. Finney said: "Why would I call anybody over to the studio?" *Id.* at 128. McDuffy responded: "We don't need nobody else coming over here and you all are not leaving until we find out what we need to know." *Id.* McDuffy asked Finney

for his phone, and Finney gave it to him. McDuffy said: "Thomas needs to tell us what we need to know or you are not going home." *Id.*

[6] At some point, McDuffy pulled a gun out and sat it on his lap "like he was not happy about Bango getting killed and he needed to know what was going on." *Id.* at 129. Robinson had an assault rifle. Keys said: "Who was telling you all this so I can confront them?" *Id.* at 131. McDuffy asked Keys and Finney if they had any weapons and started going through Finney's pockets and told him to empty his pockets. Finney gave McDuffy his phone, keys, and cash. There was a third person with McDuffy and Robinson, but the third person was hanging more toward the back so Finney could not identify him other than being black with a light-skinned complexion, braids, and "Asian-style eyes." *Id.* at 132. Finney said: "You all called us to work on a project and that is what we are here to do. We are not here to talk about no murders or none of that." *Id.* at 133. McDuffy said: "You all going to die here tonight if you don't tell us what we need to know." *Id.* McDuffy then called the third person and had him put a gun on Finney. The third person pointed a revolver at Finney and told him that he needed to back up and go back to his seat.

[7] McDuffy told Finney and Keys that they needed to strip, and Finney kicked off his shoes to let them know that he did not have a gun in his shoes. At some point, the third person let Dominique Hamler, known to Finney as Scooter, into the studio. Hamler was mad, pulled an assault rifle out of his pants, pointed it at Finney and Keys, and said: "Who killed Bango?" *Id.* at 137. Finney said that he was Keys's cousin and that they came over to work on

some music, and Hamler said: "You all need to tell us who killed Bango." *Id.* at 138. Keys said that they were questioning the wrong people. McDuffy said: "You all supposed to be tied up anyway," and "Why ain't they tied up yet?" *Id.*

[8] Hamler told Finney to "get on the ground," and the third person "kind of pushed [him] and kicked [him] to the ground." *Id.* Finney and Keys were eventually tied up with zip ties around their wrists and legs. At some point, Nathaniel Armstrong, also known as Little Nate, entered the studio "really amped up, hyped up," and asked who killed Bango and said he was ready to kill somebody. *Id.* at 141. Armstrong said: "You all better be glad they won't let me get a gun or you all would have been dead." *Id.* Armstrong grabbed a knife that looked like a box cutter and cut Keys on the leg. Armstrong said: "We doing this for Bango. He was about to blow. He was about to make it. Somebody took his life now and you all got to die." *Id.* at 142.

[9] At some point, someone placed duct tape on Keys's mouth. Someone suggested "somebody go get some gloves" to "finish off" Keys and Finney. *Id.* at 143. An older bald man entered through the back door, and said: "Is that him? Is that him?" *Id.* at 144. Robinson, Hamler, Armstrong, and the bald man left the studio. Finney, Keys, McDuffy, "and the guy with the Asian-style eyes" remained in the studio. *Id.* at 145. McDuffy told Finney: "Tell your cousin to tell us what we need to know." *Id.* at 146. McDuffy also told Finney: "Tell us something or you are not going home." *Id.*

[10]    After probably twenty minutes, Hamler, Robinson, Armstrong, and the bald man returned. McDuffy told Robinson to clean the guns, and everyone except Keys and Finney started putting on gloves. McDuffy, Armstrong, and Hamler were still interrogating Finney and Keys and said: "You about to die." *Id.* at 147. The bald man suggested that they drown Keys and Finney, electrocute them, burn them alive, shoot them, and dump their bodies. The men turned off the lights and huddled together. McDuffy said: "This ain't getting nowhere. We should just let them go because they don't know nothing." *Id.* at 149. Armstrong then said: "How you going to just let somebody kill your cousin and get away with it? We got to do something about this." *Id.*

[11]    The men huddled up a couple more times and returned, and Armstrong said: "We can strangle them. Put the zip ties around their neck." *Id.* Duct tape was placed around the wrists and faces of Keys and Finney. Finney resisted, and they kicked and punched him. The men placed a zip tie around Finney's neck and the tie was "real tight." *Id.* at 150. The men then played one of Bango's songs and were "dancing around like pumping themselves up." *Id.* Hamler said: "They was doing this for Bango." *Id.* The men left the room, and someone with dreadlocks returned and fired a gun multiple times. Finney was shot near the right wrist and "played dead." *Id.* at 151.

[12]    Finney eventually found a screwdriver and freed himself from the tape and some of the zip ties and told Keys, "Let's go, let's go," but Keys did not respond. *Id.* at 152. Finney exited the studio and went to 46th Street to seek help. Finney ended up at CVS and screamed: "I am going to die. I am going to

die. I am going to die." *Id.* at 34. Gayle Young, Jr., attempted to remove the tie but it was so tight on Finney's neck that Young "probably couldn't get [his] index finger between the wire tie and his neck . . . ." *Id.* at 35.

[13] Meanwhile, around 8:00 p.m., Adam Root was helping a friend, Alan Alas, carry groceries into a house on the corner of 46th Street and Caroline in Indianapolis. Root and Alas heard four of five gunshots coming from the west. Root then saw five, six, or seven panicked black males run out of the alley just north of where the house was located and into three separate cars.

[14] Shortly after 8:00 p.m. on November 15, 2012, Indianapolis Metropolitan Police Officer James Trythall was dispatched to the CVS store located at 4602 North Keystone for a person who had been shot. Officer Trythall found Finney shot in both arms with a zip tie around his neck and duct tape in his hair. Finney was very excited and "a little bit hysterical." *Id.* at 15. Finney told Officer Trythall that he and a friend were at a studio on 46th Street and that there was a blue minivan behind the studio, and Officer Trythall broadcast the information on the radio.

[15] Keys suffered six gunshot wounds, a cut, and "binding and ligature strangulation," and he died. *Id.* at 83. The autopsy later revealed that his death was a result of multiple gunshot wounds to the chest.

[16] At the studio, Indianapolis Metropolitan Police Detective Brian Schemenaur observed some packages of zip ties opened and unopened and determined via the UPC code on the packaging that the zip ties were a unique product sold by

Lowe's Hardware Stores. Detective Schemenaur went to the nearest Lowe's and asked Braden Pothier, the loss prevention safety manager at Lowe's, if he had happened to see some people recently purchase that particular kind of zip ties, duct tape, and those kinds of items. Detective Schemenaur then prepared a search warrant to obtain the records and video from the store. Detective Schemenaur watched the surveillance video and saw that Jackson was on the video.

Detective Schemenaur later interviewed Jackson while Jackson was working, and did not say that he had watched the Lowe's video. Jackson discussed his actions on the date of the murder including going to Value Village to purchase pants with Hart, driving around with Hart, going to see Hart's cousin, having lunch with Hart, and Hart dropping him off at work, but did not mention that he went to Lowe's, Hart's studio, or the residence of Bango's mother.

On April 11, 2013, the State charged Jackson with conspiracy to commit kidnapping as a class A felony and conspiracy to commit criminal confinement as a class B felony. The State also alleged that Jackson was an habitual offender. The State later filed an amended information which charged Jackson with the same offenses as the earlier charging information. The information relating to the conspiracy charge alleged that Armstrong, Hamler, McDuffy, Robinson, Hart, and Jackson agreed to commit criminal confinement.

On December 16, 2013, Jackson filed a motion in limine and argued that Pothier should not be allowed to testify as to the actions or speculations of the

actions of the individuals in the video, that Pothier had made the statement in a previous trial that he believed Jackson's physical actions in the video depicted Jackson as if he was showing someone else how to tie someone up or handcuff someone, and that this was pure speculation on Pothier's part.

[20] On December 20, 2013, the court held a hearing on the motion in limine. The prosecutor stated that during Pothier's deposition there were questions by defense counsel that could suggest Pothier's actions of following the defendants was because Jackson and the other men were African-American. The prosecutor also asserted that he would object to that and that the State would offer an opinion from Pothier as to why he followed them around the store if the defense presented such evidence. Defense counsel stated that it was not her intent to discuss that issue. The court granted the motion in limine and said that "[t]here are some things that could open the door to it, in my opinion" and that it would not allow Pothier to speculate as to what somebody was doing at all unless it became relevant. *Id.* at 590.

[21] On February 24, 25, and 26, 2014, the court held a jury trial. Finney, Officer Trythall, Root, Young, Detective Schemenaur, and others testified to the foregoing. During the testimony of Finney, the prosecutor asked what, if anything, Robinson or McDuffy said while they were in the studio. Jackson's counsel objected on hearsay grounds. The prosecutor argued that Robinson and McDuffy were coconspirators under Ind. Evidence Rule 801(D)(2)(E) and that statements of coconspirators made in furtherance of the conspiracy were not hearsay. The court held a hearing outside the presence of the jury. Defense

counsel argued that a conspiracy had to be shown to exist between the declarant and party against whom the statement is offered, that the statement was made during the course of the conspiracy, and that before that can be shown there has to be independent evidence that a conspiracy existed. Defense counsel further argued that there had been no presentation of any evidence of any kind of conspiracy between anyone. Defense counsel also asserted that he could not confront McDuffy or any of the other co-defendants because of their right to not testify, and that any statements were not only hearsay but violated Jackson's Sixth Amendment right to confrontation and Article 1, Section 15.[1]

[22] The prosecutor argued that "the witnesses that the State will present will certainly show and demonstrate that a conspiracy existed and in this particular case the State would ask that these statements be admitted conditioned upon them being tied up to the conspiracy that the State has alleged." *Id.* at 121. The prosecutor stated: "[Defense] [c]ounsel is correct that at this point we have not put on the video from [Lowe's] or any of that information to tie it up or anything subsequent with Detective Schemenaur, but we will and as I said, the Court is aware of that testimony from the last time we tried this case." *Id.* at 122. The court stated:

> I am going to allow this, subject to being tied up, because I believe
> from reviewing 801(D)(2) and, of course, I can take some more time to

---

[1] Jackson contends on appeal that "[a]lthough the record clearly establishes Jackson challenged the admission of the alleged co-conspirators' statements on . . . state confrontation grounds, the transcript reflects Jackson erroneously referred to the state confrontation clause as 'Article One, Section 15.'" Appellant's Brief at 38 n.2 (citing Transcript at 120).

read through all your cases and I am glad to do that, but what I am reading here in the courtroom Handbook on Indiana Evidence in Section 14, it references that the Court should make a preliminary ruling subject to reconsideration at the conclusion of the proffer's case in chief before allowing the jury to hear the evidence.[] I am not exactly sure how I can do that unless I hear the entire case and then allow them to present the entire case again to the jury, so that doesn't make a lot of sense to me. I think what I believe it to mean is that I can defer ruling on the admissibility until I get to the conclusion of the State's case. That means that I would have to go back and make a ruling, telling the jurors to disregard any of that testimony with regard to what any of the co-conspirators said, if there is not a showing of a conspiracy. Having sat through the evidence once before, it seems to me that it is likely the State may be able to present that evidence because I am pretty familiar with what has been presented previously in that there was a conspiracy, now an agreement by people, at least evidence from which a jury could find that there is a conspiracy. And they may be able by the State's evidence to find that the defendant is part of that conspiracy. I don't know that. That is a question of fact for the jury to determine. For now, I am going to allow this subject to being . . . to use the vernacular, tied up with proof of the evidence of the conspiracy, the agreement.

*Id.* at 122-123. Defense counsel clarified her objection and asserted that her objection was based upon hearsay, that "it does not fit into the exception of 802(D)(2)(e) because there has not been a showing yet that there is separate proof of a conspiracy or separate proof of a conspiracy," and "this violates my client's right to confrontation . . . ." *Id.* at 124. Defense counsel asked to show a continuing objection "to anything that any of the other people charged in this case will say." *Id.* at 125. The court indicated that the rules allowed for a continuing objection.

[23]     Finney testified that he did not know who Jackson was.  On cross-examination, Finney testified that he had never seen Jackson before the trial and that the men at the studio did not mention Jackson's name.

[24]     After Finney testified, the court took a break, reconvened, brought Juror No. 3 into the courtroom, and had a discussion with her.  The judge indicated that the chief bailiff had told her that Juror No. 3 might know one of the individuals whose name was mentioned.  Juror No. 3 indicated that was correct and that her husband may do business with the individual and was involved in the same industry.  Upon questioning by the prosecutor and defense counsel, Juror No. 3 stated that she was referring to Carlton Hart, the person identified as the studio owner by Detective Schemenaur, that she did not know anything from her relationship with Hart about the case, and that she kept that to herself.  Upon questioning by defense counsel, Juror No. 3 indicated that she did not believe that her relationship was going to have a bearing on being able to listen to the evidence and fairly decide the outcome, that she did not know Hart personally, and that she had met him once.  Upon questioning by the court, Juror No. 3 stated that her husband was in the same industry as far as making music and had actually done recordings in Hart's studio.

[25]     The following exchange then occurred:

> THE COURT:  . . .  Here is my concern.  Given that your husband works with Mr. Hart in the same business and has had dealings with him, and that Mr. Hart is alleged to be a co-conspirator of the defendant, your verdict in this case, depending on what it was . . . supposed it were to be a guilty verdict?  Were it a guilty verdict, do you

have concerns whatsoever that that might be uncomfortable for your husband?

JUROR #3: The whole situation makes me kind of nervous, actually. Just because I don't know him but I know of him and (inaudible).

*Id.* at 169-170. The court then held a sidebar conference, and defense counsel objected to the removal of Juror No. 3 because she was unbiased and "she doesn't really know what is going on." *Id.* at 170. The court stated:

I think the fact that Mr. Hart has previously been charged with murder and his previous charge of murder resulted in . . . I think it was a dismissal. Then a suit against the city which was pretty public and many of his colleagues in the business would have been aware of that, meaning that her husband would have been aware of that – might have been aware of that. She has already stated that she is uncomfortable because of the situation and because of knowing her husband's knowledge of Mr. Hart and of her own visits to the studio that is allegedly owned by Mr. Hart. I think it is way too close to put her in the situation of having to return an unbiased verdict. My concern for that and the integrity of the jury is part of my reasoning here.

*Id.* at 171.

[26] After a recess, the court stated:

My big concern here is that this juror might . . . somehow or another . . . she has already said she feels uncomfortable and the fact that she knows someone who is an alleged co-conspirator and the Court is aware of that person, Mr. Hart's, fairly public suit against the City with regard to the murder case that was dismissed against him and then, you know, it's been pretty public that he was then charged in this case. I think it puts this juror in an untenable position, regardless of her verdict. Whether it is a guilty verdict or a not guilty verdict, I think either way she becomes subject later to questions about the evidence and why she did what she did, maybe by anyone who was

involved in her community, especially since her husband is actively involved in the music industry that Mr. Hart is a part of and has been historically a part of, as well as some of the other folks that have been mentioned. For those reasons, over your objection, I am going to release her from her service. We are not in deliberations at this point. I don't believe that this places your client in grave peril in any way, and I am going to replace her with Alternate Juror #1.

*Id.* at 174-175.

[27] The court then brought Juror No. 3 into the courtroom, released her from her service, and asked her: "Do you feel some relief at that?" *Id.* at 175. Juror No. 3 stated: "Yes." *Id.*

[28] During Pothier's testimony and without objection, the court admitted the video from Lowe's which was saved at a few frames slower than live video. At a sidebar conference before playing the video, the judge stated: "What I remember about the Motion in Limine was that there not be an on-going description of all the movement and what he is seeing, what the witness observed in the video. I am going to allow the witness to place in context the location." *Id.* at 277-278. The court also stated: "But so far as interpreting what their actions are and what they are doing, that is something that I am not going to allow. I think we had a long discussion about it before and I just wanted to make sure that was your plan." *Id.* at 278. Without objection, the prosecutor informed the jury that Hart, McDuffy, and Jackson were in the video. Defense counsel later identified Jackson in the video.

Pothier testified that the individual that picked up the box cutter drew his attention because it was not uncommon for customers who want to steal from the store to come in and grab scissors, a knife, or a box cutter and use it to cut something open. On cross-examination, Pothier testified that he focused on McDuffy initially because he stopped at one of the display items at the front of the store and picked up a box cutter, but that "about halfway through" he did not think that they were stealing anything. *Id.* at 306. Upon questioning by defense counsel, Pothier testified that he continued to watch them when they were in the parking lot when there wasn't anything to steal and followed them all the way out and continued to watch them as their car drove away even though he did not think they had stolen anything and he was not watching them for that reason. The following exchange then occurred between Pothier and defense counsel:

> Q . . . Who is this white guy right here who popped up in this video right here at the bottom?
> A I do not know.
> Q Did you follow him in the store?
> A At that point, no.
> Q You didn't follow him at all, did you?
> A No, I didn't.
> Q But he was in your high theft area?
> A Yes, he was.

*Id.* at 311. The defense counsel later stated: "Again, there is that other guy. We don't know who he is, do we?" *Id.* at 312. Pothier answered: "No, we don't." *Id.*

[30] After cross-examination, the following exchange occurred at a sidebar conference:

> [Prosecutor]: She just kicked the door so wide open for me to ask not only why he was following these individuals throughout the store but what he saw them doing while he was in that store that drew his attention because she is suggesting that race is the reason he was following them around. Absolutely she did. She pointed out the white gentleman in the aisle.
>
> THE COURT: You did do that.
>
> [Defense Counsel]: I did point (inaudible).
>
> THE COURT: The inference is that . . . there is a reason that is race-related and (inaudible) I think they have a right to rebut that.
>
> [Prosecutor]: I specifically brought that up at the hearing on the Motion in Limine that if they were going to go into the racial area then absolutely the State should be able to get into why he is holding them up because of the extreme (inaudible) these individuals inside the store.
>
> [Defense Counsel]: He cannot speculate as to what he is doing in the video.
>
> [Prosecutor]: He saw it live, Judge. He can testify what he saw.
>
> [Defense Counsel]: He can't speculate as to what he saw.
>
> THE COURT: They didn't say anything about what it meant. They have no idea what it meant.
>
> [Defense Counsel]: They opened it for me on the direct that he was followed because they were (inaudible) and I had to clarify that they didn't steal anything.
>
> THE COURT: That's fine but you didn't (inaudible) repeatedly that he didn't follow the white person (inaudible) other white people.

[Defense Counsel]: I don't know if he did or if he didn't.

[Prosecutor]: (inaudible)

THE COURT: The inference has been that he (inaudible).

[Defense Counsel]: (inaudible)

THE COURT: I am not going to let him speculate but he can testify to what he physical [sic] observed.

[Defense Counsel]: I still don't see how that has anything to do with (inaudible).

THE COURT: She made it very clear that, "You continued to follow them after you did not believe they were going to steal anything."

[Defense Counsel]: (inaudible)

[Prosecutor]: (inaudible)

THE COURT: What other reason was there to follow them? You opened the door. Why did he? He has a right to ask that question.

*Id.* at 317-319.

[31] On redirect examination, Pothier testified that the acts of McDuffy picking up a box cutter, duct tape, and zip ties caught his attention because he was "trying to figure out what kind of job they were using it for." *Id.* at 320. He testified that he "saw them put their hands together" and that this caused him concern. *Id.* at 321. The following exchange then occurred:

[Defense Counsel]: At this time I am going to object. The video speaks for itself as well as the still photographs that you have already let be admitted.

THE COURT: Your response?

[Prosecutor]: Judge, as we said, the door has been wide open to this.

THE COURT: Okay. It is clear to me that there have been sort of staggered views as we watched the video. The testimony is that the witness observed it live. He can testify as to what he observed.

*Id.* Pothier testified that he "observed them putting their hands up" and that they crossed their hands and that they put their wrists together in front of them while they were looking at zip ties. *Id.* The prosecutor asked: "[I]s that the reason that you were following these individuals around the store at that time? Because of the nature of what they were buying and the actions that you saw them taking as you watched them live?" *Id.* at 322. Pothier answered: "At this point I did not believe they were going to steal. At this point I was watching because of the way they were acting." *Id.*

[32] The State presented the audio recording of jail calls in which Jackson's father asked Jackson whether he bought any of the stuff and was "in there when they checked it out," and Jackson said:

> When he bought the stuff, I wasn't on the camera at all, but when he went down the aisle and was looking at the shit and when he looked at the shit he turned around and picked up some shit and I said 'What the fuck is this shit? What you doing?' like that and I turned around and walked away from his ass.

State's Exhibit 198 at 0:07-0:27. Jackson's father asked Jackson if he went in Lowe's with them, and Jackson stated that he grabbed a bag at the door and "that's it." *Id.* at 1:10-1:20. Jackson also stated during the call that he "ain't even in there," that he "went in there and got me a m------------ bag, walked down the aisle to see him, was like 'what you doing' and turned around and walked the f--- out and went to the door goddamn it grabbed my bag and put my pants in my bag and went to go change clothes for work." *Id.* at 1:43-2:09.

During cross-examination of Detective Schemenaur, defense counsel asked what Hart said, and Detective Schemenaur testified that Hart said that they had gone back to the studio at one point and that they were when the victims arrived.

[33] After the State rested, Jackson moved for a directed verdict on both counts, and the court denied the motion. Jackson testified that he was supposed to be at Wendy's at 6:00 p.m. and work until closing. He testified that he needed to buy work pants before he went to work and that Hart, who had helped him acquire the job, picked him up "around 11:00-ish" and "[t]owards the afternoon." Transcript at 402. He testified that Hart took him to Goodwill and then Value Village, and he bought a pair of pants. According to his testimony, the bag for the pants broke, Hart took Jackson to McDonald's and bought him some food, the two then went to pick up Dwayne who was Hart's cousin and the father of McDuffy. The men then went down Raymond Street to a video place where Dwayne went in and returned. They went to the house of another of Dwayne's sons and then to a pawn shop. Jackson, Dwayne, and Hart then went to the residence of Bango's mother. Jackson and Hart then dropped off Dwayne at his son's house and were headed up Keystone toward the studio when McDuffy called Hart. Hart and Jackson then picked up McDuffy at 66th and Keystone. Jackson testified that he was "just going along for the ride." *Id.* at 409. Hart said that he had to stop at Lowe's "because he said he was going to close up his shop for a couple of days because there was too much drama going on about this killing and all that." *Id.* Hart said that he "was getting a board to close up

the back door because he didn't want nobody to kick in the door and steal all his equipment because it's on an alley." *Id.* Hart, Jackson, and McDuffy then went to Lowe's. When asked whether he went into Lowe's with Hart, Jackson stated: "Yeah. Initially, I hadn't started to get out but then I said it was cold out there and no telling how long they was going to be in the store. I was like, 'I got to go get some bags anyway[],' because my bag had broke – the handle." *Id.* at 409-410. He testified that he was looking for items for Hart's studio and explained where a camera would sit at the studio, and that he told McDuffy to purchase black zip ties instead of white zip ties because the white zip ties could be seen against the black trim of Hart's studio.

[34] On cross-examination, the prosecutor asked: "You are inside the [Lowe's], wandering around, doing things, but in that May 9 jail call, you didn't mention that. Correct?" *Id.* at 438. Jackson said: "Why? Why would I?" *Id.* The prosecutor also said: "When you talked to Detective Schemenaur on November 28, you said that at most you had spent was maybe forty-five minutes to an hour with [Hart]?" *Id.* at 449. Jackson said: "Well, I was really trying to brush him off because he was making me lose my job, actually." *Id.* Jackson later indicated that the time he was with McDuffy and Hart was well over forty-five minutes. The prosecutor also asked Jackson about Hart's statement that he was at the studio when Finney and Keys arrived, and defense counsel objected on hearsay grounds. The prosecutor argued that he was just repeating what Detective Schemenaur testified, and the court overruled the objection.

On rebuttal, Detective Schemenaur testified that he went through the studio on November 15, evaluated which items were to be collected for evidence, was familiar with the contents of the studio, and did not see anything relating to a security system or security equipment. Detective Schemenaur later indicated that at one point in the video from the studio, there is a small box that says "Security Camera" on it. *Id.* at 483.

After the parties rested, Jackson's counsel renewed her objection made during Finney's testimony, argued that nothing had been presented to the jury, and requested a final ruling. The following exchange then occurred:

> THE COURT: Okay. All right. First of all, the statements made by alleged co-conspirators were admissible when proffered by the State. Those statements did not refer to Mr. Jackson, they referred only to what was taking place at the time Mr. Finney . . . Those statements referred to what Mr. Finney believed was taking place in the studio. Those same statements made by co-conspirators or alleged co-conspirators are not admissible, according to what my understanding of the law is, when offered by the defendant, only when offered by the State. Then as to the portion of your argument which went to . . .
>
> [Defense Counsel]: Confrontation.
>
> THE COURT: Confrontation. Right. That is the Bruton issue you are raising, if I understand you correctly. Sadly, he is charged with his co-conspirators and in that situation the State can present that evidence, even though you cannot necessarily cross examine it. Your client is being tried separately, not for Bruton reasons, but for other reasons that we have gone over at other hearings. As to when that testimony with regard to agreement and what happened, etc., and the statements of the other folks, when that becomes admissible . . . statements of co-conspirators become admissible when there is some showing that there is a conspiracy. You know, the State offered to tie it up and there has been evidence presented from which the jurors could find that there was an agreement based on circumstantial

evidence. The two things specific that I would point to would be whatever their interpretation is of the defendant's actions on the video at [Lowe's]. There is certainly one interpretation that could be made: that the defendant was assisting Mr. Hart and Mr. McDuffy in determining what size of zip ties were necessary in order to bind someone's wrists. There is also his own interpretation of that, and explanation, which the jurors could find credible, as well. So it is up to the jurors as to that, but there is evidence there. Then the fact that there is evidence that there is conflicting statements that the defendant has made, not just to Detective Schemenaur but during his own testimony, as well. He contradicted himself which might make it something the jurors could use, as well. I think there is enough evidence to send it to the jury.

*Id.* at 476-478.

[37] The jury found Jackson not guilty of conspiracy to commit kidnapping as a class A felony and guilty of conspiracy to commit criminal confinement as a class B felony. The jury later found Jackson was an habitual offender, but the court granted a dismissal of that charge and vacated the jury's verdict with respect to the habitual offender allegation. The court sentenced Jackson to eighteen years in the Department of Correction for his conviction of conspiracy to commit criminal confinement as a class B felony.

## *Analysis*

### I.

[38] The first issue is whether the trial court abused its discretion in replacing Juror No. 3 with an alternate. Jackson argues that the court abused its discretion in excusing Juror No. 3 in the midst of the trial and failed to comply with Indiana

Jury Rule 24 because the court did not place Juror No. 3 under oath.[2]  Jackson argues that Jury Rule 24 authorized removal of Juror No. 3 only if she had personal knowledge of a material fact which Juror No. 3 did not.  He points out that Juror No. 3 never indicated she was struggling with her duty to remain impartial.  He asserts that the trial court's suggestion that Juror No. 3 could have suffered retaliation if she entered a guilty verdict as to Jackson is troubling, and the court's suggestion that a guilty verdict for Jackson would result in Juror No. 3 undergoing post-trial inquiry from her community is speculative and reflects an inappropriate bias and prejudice.  Jackson also asserts that Ind. Code § 35-37-1-5, which lists good causes for challenge to any person called as a juror in any criminal trial, does not authorize the trial court's excusal of Juror No. 3.

[39]  The State argues that the court acted within its discretion in dismissing Juror No. 3 because the local music scene was at the heart of the case.  The State asserts that the court's authority to dismiss a juror is not limited to only those statutory reasons that disqualify a person from jury service or that would have supported a challenge for cause during voir dire, nor is it limited only to cases where the juror has personal knowledge of a material fact about the case.  The State maintains that Jackson's argument that the trial court failed to follow the procedure in Indiana Jury Rule 24 is waived because he failed to object on the

---

[2] Ind. Jury Rule 24 provides: "If the court receives information that a juror has personal knowledge about the case, the court shall examine the juror under oath in the presence of the parties and outside the presence of the other jurors concerning that knowledge.  If the court finds that the juror has personal knowledge of a material fact, the juror shall be excused, and the court shall replace that juror with an alternate.  If there is no alternate juror, then the court shall discharge the jury without prejudice, unless the parties agree to submit the cause to the remaining jurors."

basis of Rule 24 and never objected on the basis that the court needed to put the juror under oath. Lastly, the State asserts that Jackson cannot show any prejudice as a result of the ruling.

[40] "The claim here turns on the critical role of firsthand observation in determining whether any juror–irrespective of relationships with expected witnesses–may be unable to reach a decision free from extraneous considerations." *Barnes v. State*, 693 N.E.2d 520, 523 (Ind. 1998). "Trial judges have 'significant leeway' in making this determination because 'they see jurors firsthand and are in a much better position to assess a juror's ability to serve without bias or intimidation and decide the case according to law.'" *Id.* (quoting *Jervis v. State*, 679 N.E.2d 875, 881-882 (Ind. 1997)). The decision to replace a juror with an alternate is reviewed for an abuse of discretion. *Id.*

[41] As pointed out by the State, Jury Rule 24 provides that the court shall replace a juror with an alternate if the court finds that the juror has personal knowledge of a material fact, but Rule 24 does not provide that this is the only time a court may excuse a juror. Ind. Code § 35-37-1-5 lists good causes for challenge to any person called as a juror in any criminal trial, and Ind. Code § 35-37-1-6 provides that all challenges for cause shall be made before the jury is sworn to try the cause. We cannot say that Ind. Code § 35-37-1-5 requires reversal.

[42] On appeal, Jackson does not argue that the replacement or alternate juror was biased. The record reveals that Juror No. 3 indicated at one point that she did not believe her relationship was going to have a bearing on being able to listen

to the evidence and decide fairly the outcome. However, Juror No. 3 also indicated that her husband may do business with Hart, was involved in the same industry, and had actually done recordings in Hart's studio. She also stated that the "whole situation" made her "kind of nervous." Transcript at 170. After the court released her, Juror No. 3 indicated she was relieved. Under the circumstances, we cannot say that the trial court abused its discretion. *See Barnes*, 693 N.E.2d at 523 (holding that the trial court did not abuse its discretion by releasing a juror where the juror asserted he believed he could render a verdict based on the evidence, but where the trial court expressed concerns about the juror's demeanor).

## II.

[43] The next issue is whether the trial court abused its discretion in admitting certain testimony. Generally, we review the trial court's ruling on the admission of evidence for an abuse of discretion. *Noojin v. State*, 730 N.E.2d 672, 676 (Ind. 2000). We reverse only where the decision is clearly against the logic and effect of the facts and circumstances. *Joyner v. State*, 678 N.E.2d 386, 390 (Ind. 1997), *reh'g denied*. We may affirm a trial court's decision regarding the admission of evidence if it is sustainable on any basis in the record. *Barker v. State*, 695 N.E.2d 925, 930 (Ind. 1998), *reh'g denied*. Even if the trial court's decision was an abuse of discretion, we will not reverse if the admission constituted harmless error. *Fox v. State*, 717 N.E.2d 957, 966 (Ind. Ct. App. 1999), *reh'g denied*, *trans. denied*.

[44] Jackson challenges the admission of portions of: (A) Pothier's testimony; (B) Finney's testimony; and (C) Detective Schemenaur's testimony.

A. *Pothier's Testimony*

[45] Jackson argues that the court abused its discretion in admitting the testimony of Pothier interpreting the events on the security videotape, and that his testimony violated Ind. Evidence Rule 701 "given that it amounted to a lay opinion which did not meet the requirements of that rule." Appellant's Brief at 22. Jackson asserts that Pothier's testimony was not helpful to a clear understanding of his testimony or the determination of a fact in issue, contrary to the requirements of Rule 701, that the jury could see and interpret the very actions about which Pothier was testifying, and that under the silent witness theory, videotapes and photographs must stand on their own without additional commentary or interpretation. Jackson argues that his counsel's reference to the other shopper as white was for descriptive purposes only, not to suggest some sort of racial profiling or discrimination. He contends that the State relied on Pothier's speculative testimony regarding the crossed hands as its primary evidence of an agreement between Jackson and the alleged coconspirators. Lastly, Jackson alleges that, even if Pothier's speculative testimony was relevant to refute an inference of racial profiling, the prejudicial impact of such evidence far outweighed its probative value, which, at best, was minimal.

[46] The State argues that the trial court properly allowed the loss prevention officer to testify as to the conduct he personally observed, and that Jackson's reliance

on "silent witness" case law is misplaced because Pothier was not testifying as to his interpretation of what the video footage on State's Exhibit 149 depicted but rather to his own personal observations as he watched the men live on November 15th. Appellee's Brief at 21. The State also notes that the recorded video is not a "continuous live stream image" so it is possible for things to be observed live that are not completely captured on the recording. *Id.* The State argues that Ind. Evidence Rule 701 is inapplicable because Pothier was not testifying as to his opinion regarding the meaning of the conduct he observed but testified only as to the fact of the conduct he observed. The State further argues that even if Pothier had testified as to his opinion or his interpretation of the meaning of what he observed, that testimony would have been admissible under Evidence Rule 701 because it would have been rationally based on his perception and it would have been helpful to a jury's determination of a fact at issue, namely, whether Jackson knew about and was acting in agreement with the plan to confine someone. The State contends that, even if the testimony was otherwise inadmissible, the court's ruling was still proper because Jackson opened the door to its admission. It asserts that the "crystal-clear suggestion from the cross-examination was that Pothier was engaging in racial profiling and that the only reason he had continued to watch the men was because they were African-American." *Id.* at 20. The State maintains that Jackson cannot simultaneously try to use this as both shield and sword, preventing the jury from hearing the witness's true explanation while being allowed to suggest false explanations that the witness is not allowed to correct. Lastly, the State asserts that any error in the admission of this evidence was harmless because the jury

had the opportunity to view the surveillance video several times and view the still shots from the video.

[47] At the time of the trial, Ind. Evidence Rule 701 provided:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>
> (a) rationally based on the witness's perception; and
>
> (b) helpful to a clear understanding of the witness's testimony or to a determination of a fact in issue.

[48] Pothier testified that the video from the security cameras is saved at a few frames slower than live video to save space and that when he was watching the video on November 15th he would see a live feed as if he was watching television. On redirect examination, the prosecutor asked Pothier: "Did anything happen after this that you saw as you were watching live, not at a staggered or slower rate of frames in the video? Did you see anything as you watched live that caused you concern?" Transcript at 320. Pothier answered affirmatively. Our review of the surveillance video indicates that the video was somewhat choppy because it was saved with fewer frames. Under the circumstances, we conclude that Pothier's testimony was rationally based on the witness's perception and helpful to a clear understanding of the witness's testimony or to a determination of a fact in issue.

[49] Even assuming that the testimony was not admissible under Rule 701, otherwise inadmissible evidence may be admitted where the defendant opens the door to questioning on that evidence. *Clark v. State*, 915 N.E.2d 126, 130

(Ind. 2009) (citing *Jackson v. State*, 728 N.E.2d 147 (Ind. 2000)), *reh'g denied*. The door may be opened when the trier of fact has been left with a false or misleading impression of the facts. *Id.*

[50] The record reveals that the prosecutor expressed a concern at the hearing on the motion in limine that questions by defense counsel during the deposition of Pothier could suggest that Pothier observed the actions of Jackson and the others in Lowe's because they were African-American. The court granted the motion in limine and said that "[t]here are some things that could open the door to it, in my opinion" and that it would not allow Pothier to speculate as to what somebody was doing at all unless it became relevant. Transcript at 590. During the cross-examination of Pothier, defense counsel asked Pothier who the "white guy" was, twice asked whether Pothier followed him in the store, and confirmed with Pothier that the white person was in the high theft area.

[51] Following the prosecutor's argument that defense counsel opened the door to ask why Pothier followed Jackson and the others and what he saw them doing, the court stated that "[t]he inference . . . that has been made is that there is a reason that is race-related and (inaudible) I think they have a right to rebut that." *Id.* at 317. Based on the record, we conclude that the trier of fact was left with a false or misleading impression as to the fact or reason Pothier was focusing on Jackson and the other men with him.

[52] Under these circumstances, we cannot say that the trial court abused its discretion by admitting Pothier's testimony as to his reason for following

Jackson and the men with him. *See Turner v. State*, 953 N.E.2d 1039, 1056 (Ind. 2011) (holding that the defendant injected into the trial a certain issue and that having opened the door during cross-examination of a supposed disagreement, the defendant was in no position to complain of contrary evidence elicited by the State on redirect examination).

## B. *Finney's Testimony*

[53] Jackson argues that the trial court abused its discretion in admitting the testimony of Finney as to statements made by the perpetrators during the confinement and shooting based on: (1) hearsay grounds; and (2) Article 1, Section 13 of the Indiana Constitution.

### 1. *Hearsay*

[54] Jackson asserts that the State had presented no evidence of any conspiracy at the time it first attempted to introduce the out-of-court statements by the alleged coconspirators. He asserts that a witness such as Finney may testify about the statements of one of the conspirators only where independent evidence exists that there was a conspiracy and that the defendant was part of it. He also asserts that evidence establishing a conspiracy in which the defendant was involved is a prerequisite to admission of statements of coconspirators under Ind. Evidence Rule 801(d)(2)(E).

[55] The State concedes that the trial court recognized that the necessary evidence had not yet been adduced. However, the State notes that Jackson does not

argue that, during the trial as a whole, the State failed to present sufficient evidence of a conspiracy rendering these statements admissible under Rule 801(d)(2)(E). The State points out that "this same judge had previously presided over a trial of several of the other co-conspirators; thus, the judge was very familiar with the evidence in this case." Appellee's Brief at 31.

[56] We observe that Finney testified generally that the individuals holding him and Keys repeatedly asked who killed Bango and ordered them to provide the identity of the person who killed Bango. The Indiana Supreme Court has noted that "[o]nly statements which are capable of being proven true or false can constitute hearsay." *Pierce v. State*, 705 N.E.2d 173, 176 n.3 (Ind. 1998) (citing 13 ROBERT LOWELL MILLER, JR., INDIANA PRACTICE, INDIANA EVIDENCE § 801.304, at 505 (2nd ed. 1995)). "Accordingly, the hearsay rule does not bar commands, requests, or questions." *Id.* (citing *Bustamante v. State*, 557 N.E.2d 1313, 1316 (Ind. 1990)). The repeated questions and commands to Finney and Keys are not hearsay because they are incapable of being proven true or false. *See id.* (holding that portions of letters requesting forgiveness were not hearsay because they were incapable of being proven true or false).

[57] To the extent that some of Finney's testimony with respect to what others said could be proven true or false, we cannot say that reversal is warranted. Ind. Evidence Rule 801(d)(2)(E) provides that "a statement is not hearsay if . . . [t]he statement is offered against an opposing party and . . . was made by the party's coconspirator during and in furtherance of the conspiracy." "The existence of the conspiracy may be shown by direct or circumstantial evidence, and the

evidence need not be strong." *Wright v. State*, 690 N.E.2d 1098, 1105 (Ind. 1997), *reh'g denied*.

[58] With respect to Jackson's argument that the State failed to present evidence of a conspiracy prior to introducing the statements of the coconspirators, we note that generally, before the statements of one conspirator are admissible into evidence, the trial court must determine, by a preponderance of the evidence, whether the declarant and the defendant were involved in a conspiracy and that the statement was made during and in furtherance of that conspiracy. *See Lott v. State*, 690 N.E.2d 204, 209 (Ind. 1997); *Wright*, 690 N.E.2d at 1105 (Ind. 1997). However, "the trial court has broad discretion in determining the order of proof and in controlling trial proceedings." *Wray v. State*, 547 N.E.2d 1062, 1066 (Ind. 1989); *see also* Ind. Evidence Rules 611(a) and 104(b).[3]

[59] In *Miller v. State*, the Indiana Supreme Court addressed a similar situation and held:

> Appellant complains of the admission of the testimony of a witness, concerning acts and declarations of one of the alleged coconspirators, at a point in the trial at which he says a prima facie case of conspiracy against those charged had not been established. The state relied upon circumstantial evidence. If, in such cases, evidence of the circumstances upon which the state relies to establish the conspiracy is

---

[3] Ind. Evidence Rule 611(a) provides that "[t]he court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to: (1) make those procedures effective for determining the truth; (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment." Ind. Evidence Rule 104(b) provides: "When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist. The court may admit the proposed evidence on the condition that the proof be introduced later."

all excluded until the conspiracy is established, it may become impossible for the state to proceed. It is well settled that the order of proof is a matter largely within the discretion of the court. It is true that, unless there is evidence connecting an alleged coconspirator with the defendant in a conspiracy, acts and statements of the alleged coconspirator should not be permitted to go to the jury, and if proof of such acts and statements has been admitted, it should under such circumstances be withdrawn from the jury by proper instruction. But acts and statements of one of the parties to an alleged conspiracy, in the presence of the others, may of themselves, under some circumstances, be evidence of the conspiracy. If there was sufficient evidence from which the jury could find that there was a conspiracy, the admission of the evidence was not error. *Cook v. State* (1907) 169 Ind. 430, 82 N.E. 1047.

211 Ind. 317, 320-321, 6 N.E.2d 948, 949-950 (1937). We find *Miller* instructive. *See also* 8 I.L.E. *Criminal Law* § 209 (2005) ("Ordinarily, proof of the existence of the conspiracy should be introduced prior to proving any acts or declarations of a coconspirator or codefendant. However, since the order in which evidence is introduced is largely within the discretion of the court, acts or declarations of a coconspirator or codefendant may be admitted in evidence before sufficient proof of the conspiracy is given, where such acts and declarations may, of themselves, be evidence of the conspiracy, or where the prosecution gives assurance that it will undertake to produce such proof subsequently. If proof of such acts or declarations is admitted without

establishing the existence of the conspiracy, the jury should be instructed to disregard it unless it is satisfied that one exists.") (footnotes omitted).[4]

[60] In this case, the trial court indicated that it would allow Finney to testify as to what Robinson or McDuffy said "subject to being tied up." Transcript at 122. We also observe that the judge stated: "Having sat through the evidence once before, it seems to me that it is likely the State may be able to present that evidence because I am pretty familiar with what has been presented previously in that there was a conspiracy, now an agreement by people, at least evidence from which a jury could find that there is a conspiracy." *Id.* at 123. The State later presented evidence that: (1) Jackson spent part of the day with Hart, the owner of the studio where the confinement and shooting occurred, and McDuffy, one of the men that confined and interrogated Finney and Keys; (2) Jackson and Hart visited the home of Bango's mother on the day of the confinement; (3) Jackson was with McDuffy in Lowe's on the day of the confinement; (4) the surveillance video from Lowe's shows Jackson crossing his arms and placing zip ties in the cart; and (5) McDuffy purchased zip ties while at Lowe's. The independent evidence demonstrates by a preponderance of the evidence that a conspiracy between Jackson and the others existed. Under the circumstances, we cannot say that the court abused its discretion.

---

[4] Jackson argues that the State could not admit the statements and establish a conspiracy later and cites to *Lott v. State*, 690 N.E.2d 204 (Ind. 1997); *Chinn v. State*, 511 N.E.2d 1000 (Ind. 1987), *reh'g denied*; and *Roush v. State*, 875 N.E.2d 801 (Ind. Ct. App. 2007). These cases did not address the scenario in which a trial court admits evidence subject to the subsequent admission of evidence of a conspiracy.

## 2. *Article 1, Section 13*

[61] Jackson argues that the admission of the statements of the alleged coconspirators violated Article 1, Section 13 because he never had the opportunity to cross-examine the declarants, whom the State did not produce at trial, and he was unable to meet the declarants face to face.[5] The State argues that Jackson waived this claim by failing to present a cogent argument. It asserts that Jackson does not provide any argument or analysis to explain how or why the Indiana confrontation provision should be interpreted differently from the federal provision in this regard.

[62] Jackson does not argue that the admission of Finney's testimony with respect to the statements of Robinson, McDuffy, and the others at the studio violated the Sixth Amendment.[6] As noted by the State, this court has held that coconspirator statements are not testimonial and do not implicate the Sixth Amendment right of confrontation. *See Hightower v. State*, 866 N.E.2d 356, 366 (Ind. Ct. App. 2007) (holding that the defendant's Confrontation Clause argument was unavailing because coconspirator statements are nontestimonial), *trans. denied*; *Jones v. State*, 834 N.E.2d 167, 168-169 (Ind. Ct. App. 2005) (addressing a defendant's Sixth Amendment argument and holding that a

---

[5] Article 1, Section 13 of the Indiana Constitution provides: "In all criminal prosecutions, the accused shall have the right . . . to meet the witnesses face to face, and to have compulsory process for obtaining witnesses in his favor."

[6] Jackson does argue that the testimony by Detective Schemenaur regarding Hart's statement violated the Sixth Amendment. This argument is addressed in Part II.C.

coconspirator's statement is nontestimonial, that the decision to admit such a statement is a determination that is governed by the Indiana Evidence Rules, and that the statement clearly fell within the definition provided by Ind. Evidence Rule 801(d)(2)(E)).

[63] While Jackson points out that Article 1, Section 13 of the Indiana Constitution contains both the right to cross-examination and the right to meet witnesses face-to-face in the courtroom during trial, he has not explained or offered an argument as to why an analysis of the Indiana Constitution concerning the testimonial character of a statement is or should be any different than the federal analysis. Accordingly, we cannot say that Jackson's rights under Article 1, Section 13 were violated. *See Turner*, 953 N.E.2d at 1055 n.8 ("Although "[t]o a considerable degree, the federal right of confrontation and the state right to a face-to-face meeting are co-extensive," *Brady v. State*, 575 N.E.2d 981, 987 (Ind. 1991), the rights guaranteed by our state constitution are not necessarily identical to those provided by the federal constitution. *State v. Owings*, 622 N.E.2d 948, 950 (Ind. 1993). However, Turner has not explained and offers no argument as to why an analysis of the Indiana constitution concerning the testimonial character of a statement is or should be any different than the federal analysis. Our conclusion concerning Turner's federal constitutional claim applies equally to his state constitutional claim."). Therefore, we cannot say the trial court abused its discretion in admitting Finney's testimony.

## C. *Testimony of Detective Schemenaur*

[64] Jackson argues that the trial court abused its discretion by admitting the testimony of Detective Schemenaur that Hart told him that Jackson was at the studio when Finney and Keys arrived. Jackson asserts that Hart's statements as to his whereabouts on the day of the shootings could not have been made in furtherance of the conspiracy because the statement placed Hart and Jackson at the scene of the shootings but Hart denied involvement. Thus, Jackson concludes that Hart's statement was not made in furtherance of the conspiracy and it was not admissible under the express terms of Ind. Evidence Rule 801(d)(2)(E). Jackson argues Hart's alleged statement to Detective Schemenaur was testimonial, the State never established Hart was unavailable to testify, the record reveals no opportunity by Jackson to cross-examine Hart as to his statements to Detective Schemenaur, and thus the testimonial hearsay was inadmissible under the Sixth Amendment.

[65] The State argues that any error in the admission of Hart's statement to Detective Schemenaur would constitute invited error because it was elicited by Jackson. The State asserts that a defendant may not elicit evidence and then object when the State questions the defendant about that evidence. The State also contends that any error was at most harmless because Jackson admitted that he and Hart went to the studio that afternoon after going to Lowe's, and Finney testified that he did not identify Jackson, did not know who Jackson was, and had never seen Jackson prior to the day of the trial. The State also points to the strength of the evidence in its case and asserts that "it made little

appreciable difference to the strength of the State's case whether Defendant left the premises a minute before the victims arrived or a minute after."  Appellee's Brief at 28.

[66] In his reply brief, Jackson asserts that "it was only a matter of time before Schemenaur's testimony regarding Hart's statement would have been offered by the State" and the fact "[t]hat the testimony was introduced first during Jackson's cross-examination of Schemenaur was not invited error because it is clear such testimony would have been offered by the State and admitted by the trial court."  Appellant's Reply Brief at 6.

[67] Jackson cites to pages 385 and 451 of the transcript.  Page 385 contains the re-cross examination of Detective Schemenaur by defense counsel and the following exchange:

> Q  And Adam Root or any witnesses that you talked to at the scene didn't say he was at the studio.  Is that correct?
>
> A  Well, at the scene?
>
> Q  At the scene.
>
> A  Yes, there was a person at the scene that eventually said that Mr. Jackson was at the scene.
>
> Q  Mr. Hart did say that they had gone back to the studio at one point.  Is that correct?
>
> A  That is correct.
>
> Q  But not during this horrible kidnapping and shooting of Mr. Finney and Thomas Keys?
>
> A  At the arrival of the victims, he said that they were there.
>
> [Defense Counsel]:  That's all I have, Judge.

Transcript at 385. During the cross-examination of Jackson, the following exchange occurred:

> Q You heard Detective Schemenaur testify that Carlton Hart said you were at the studio with Carlton Hart when the victims arrived?
>
> A No.
>
> Q That's wrong?
>
> A That's wrong. I wasn't at the studio when they arrived. I was at work already. Wasn't nobody at the studio but Dwayne McDuffy when I left. I mean James.
>
> Q Carlton Hart said that you were there.
>
> [Defense Counsel]: Objection, Your Honor. Hearsay. He is trying to get in what Carlton Hart said.
>
> [Prosecutor]: I am just repeating what Detective Schemenaur testified to.
>
> THE COURT: The State can ask those kind of questions, however, the defendant does not have the ability, under the rules, to bring in hearsay about alleged co-conspirators.
>
> [Defense Counsel]: I will raise the same objection that I had raised prior about other people testifying, based on Sixth Amendment right of confrontation as well as (inaudible) in the rules.
>
> THE COURT: Understood and overruled.
>
> Q Carlton Hart said you were there when the victims arrived. And you are saying you weren't?
>
> A I wasn't.

*Id.* at 451-452.

[68]     Given that Jackson's counsel elicited the hearsay testimony and specifically asked Detective Schemenaur what Hart had said, we cannot say that reversal is warranted. *See Szpunar v. State*, 783 N.E.2d 1213, 1217 (Ind. Ct. App. 2003)

(holding that no reversible error occurred because the defendant was the party who elicited the evidence at issue); *Taylor v. State*, 687 N.E.2d 606, 611 (Ind. Ct. App. 1997) (observing that defense counsel elicited the hearsay testimony himself and holding that any error in admitting the testimony was therefore invited by the defense), *trans. denied*.

### III.

[69] The next issue is whether the evidence is sufficient to sustain Jackson's conviction for conspiracy to commit criminal confinement as a class B felony. When reviewing claims of insufficiency of the evidence, we do not reweigh the evidence or judge the credibility of witnesses. *Jordan v. State*, 656 N.E.2d 816, 817 (Ind. 1995), *reh'g denied*. Rather, we look to the evidence and the reasonable inferences therefrom that support the verdict. *Id.* We will affirm the conviction if there exists evidence of probative value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. *Id.*

[70] The offense of conspiracy is governed by Ind. Code § 35-41-5-2, which at the time of the offense provided that "[a] person conspires to commit a felony when, with intent to commit the felony, he agrees with another person to commit the felony," that "[a] conspiracy to commit a felony is a felony of the same class as the underlying felony," and that "[t]he state must allege and prove

that either the person or the person with whom he agreed performed an overt act in furtherance of the agreement."[7]

[71] Here, the underlying felony is criminal confinement as a class B felony. The offense of criminal confinement as a class B felony is governed by Ind. Code § 35-42-3-3, which at the time of the offense provided that "[a] person who knowingly or intentionally: (1) confines another person without the other person's consent; or (2) removes another person, by fraud, enticement, force, or threat of force, from one (1) place to another; commits criminal confinement." "The offense of criminal confinement . . . is . . . a Class B felony if it . . . (A) is committed while armed with a deadly weapon; [or] (B) results in serious bodily injury to a person other than the confining or removing person . . . ." Ind. Code § 35-42-3-3(b).[8] The amended charging information alleged:

> Nathaniel Armstrong, Dominique Hamler, James McDuffy, Dontee Robinson, Carlton Hart and Darin Jackson, on or about November 15, 2012, did, with intent to commit the felony of Criminal Confinement, agree by and with one another to commit said felony of Criminal Confinement, which is to knowingly, while armed with a deadly weapon, that is: a gun, confine another person without the other person's consent, and, further, that Nathaniel Armstrong, Dominique Hamler, James McDuffy, Dontee Robinson, Carlton Hart, and/or Darin Jackson performed the following overt act in furtherance of the agreement, that is: purchased zip-ties, duct tape and a piece of wood to be used in confining Keys and/or Finney and/or by holding Keys and/or Finney in the music studio at gunpoint . . . .

---

[7] Subsequently amended by Pub. L. No. 158-2013, § 409 (eff. July 1, 2014).

[8] Subsequently amended by Pub. L. No. 158-2013, § 434 (eff. July 1, 2014).

Appellant's Appendix at 151-152.

[72]   Jackson argues that the State failed to present any admissible evidence of any conspiracy and no evidence at all of Jackson's involvement in any conspiracy. Jackson also argues that even if the State proved an agreement among Jackson's codefendants, the State failed to prove Jackson entered into that agreement. He asserts that the State failed to present any evidence that he ever met Armstrong, Hamler, and Robinson. He contends that the videotape showed him only belatedly joining McDuffy in the electrical aisle at Lowe's and that he replaced one bag of zip ties in the shopping cart with another bag of zip ties. He argues that the items purchased were consistent with supplies necessary to enhance security at the studio.

[73]   The State argues that the evidence that there was an agreement to confine Keys and/or Finney in the music studio without their consent is overwhelming, and that Jackson's arguments are simply a request for this court to reweigh the evidence. The State points out that Jackson and Hart had been close friends since childhood, Bango was Hart's cousin, Hart helped Jackson obtain the job he held at the time, and Jackson and Hart went to visit Bango's mother on the same day of the confinement. The State also asserts that Jackson went to Lowe's with Hart and McDuffy when they purchased the zip ties and duct tape used that afternoon to effectuate the confinement, that Jackson helped pick out the zip ties, and Jackson demonstrated crossing his hands together at the wrist in the same way that the victim's hands were later bound. The State also points out that Jackson demonstrated consciousness of guilt when he concealed the

fact that he went to Lowe's when he spoke with Detective Schemenaur, and did not admit on the jail phone calls that he walked around Lowe's with McDuffy and Hart and helped them select zip ties.

[74] "In proving the agreement element, the State is not required to show an express formal agreement, and proof of the conspiracy may rest entirely on circumstantial evidence." *Fry v. State*, 748 N.E.2d 369, 374 (Ind. 2001) (citing *Bailey v. State*, 717 N.E.2d 1, 3 (Ind. 1999)). The requisite agreement can be inferred from circumstantial evidence, including overt acts of the parties in furtherance of the criminal act. *Wallace v. State*, 722 N.E.2d 910, 913 (Ind. Ct. App. 2000). "[W]hile evidence of a mere relationship or association is not sufficient, a conspiracy may be inferred from acts of the parties in pursuance of an apparent criminal purpose they have in common." *Williams v. State*, 274 Ind. 94, 96, 409 N.E.2d 571, 573 (1980). "Any testimony tending to show an accused's attempt to conceal implicating evidence or to manufacture exculpatory evidence may be considered by the trier of fact as relevant because it reveals a consciousness of guilt." *Hughes v. State*, 546 N.E.2d 1203, 1208 (Ind. 1989).

[75] The record reveals that Jackson had a relationship with Hart, the owner of the studio where the confinement occurred and Bango's cousin. Jackson spent part of the day with Hart and McDuffy, one of the men that confined and interrogated Finney and Keys. Jackson and Hart visited the home of Bango's mother on the day of the confinement. Jackson was with McDuffy in Lowe's on the day of the confinement and the surveillance video from Lowe's shows

Jackson crossed his arms while looking at zip ties and placed zip ties in the shopping cart. On appeal, Jackson concedes that he "held a bag of zip ties and spoke to McDuffy." Appellant's Brief at 9. Jackson did not mention to Detective Schemenaur during his interview that he went to Lowe's. During the phone call from jail with his father, Jackson indicated that he "wasn't in there when they checked it out," that he grabbed a bag at the door and "that's it," and that he "went in there and got me a m------------ bag, walked down the aisle to see him, was like 'what you doing' and turned around and walked the f--- out and went to the door goddamn it grabbed my bag and put my pants in my bag and went to go change clothes for work." State's Exhibit 198. The jury was able to weigh these statements together with the surveillance video which Jackson concedes on appeal shows him replacing one bag of zip ties in the shopping cart with another bag of zip ties. The jury was free to not credit Jackson's testimony that he entered Lowe's merely to obtain a bag for his pants that he had purchased earlier in the day and planned to wear to work later in the day.

[76] While the jury could have made different inferences from the evidence, we cannot say that the inferences made by the jury were unreasonable. Thus, we conclude that evidence of probative value exists from which the jury could have

found Jackson guilty beyond a reasonable doubt of conspiracy to commit criminal confinement as a class B felony.[9]

## *Conclusion*

For the foregoing reasons, we affirm Jackson's conviction for conspiracy to commit criminal confinement as a class B felony.

Bailey, J., and Robb, J., concur.

---

[9] Jackson argues that this case in similar to *Cockrell v. State*, 743 N.E.2d 799 (Ind. Ct. App. 2011). In *Cockrell*, we reversed a conviction for conspiracy to deal in cocaine where there was no evidence that the defendant and an alleged coconspirator ever met or made contact with each other during the relevant time and there was uncontradicted testimony from another alleged coconspirator that he never mentioned another coconspirator to the defendant. 743 N.E.2d at 806-807. The *Cockrell* court relied upon *Porter v. State*, 715 N.E.2d 868 (Ind. 1999), where the Indiana Supreme Court reversed a conviction for conspiracy to commit robbery where there was no evidence that the defendant and the alleged coconspirator were together at any time before, during or after the incident, no evidence that they arrived at, or left, the scene together, no evidence that the two spoke, gestured or communicated with one another at any point before, during, or after the incident, and no evidence that the two were even aware of one another's presence at the time the incidents occurred. *Id.* at 807 (citing *Porter*, 715 N.E.2d at 872). Unlike in *Cockrell* and *Porter*, Jackson was with Hart and McDuffy prior to the confinement and his actions constitute evidence from which a jury could have found that he agreed to confine Keys and/or Finney.